# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JUN 2 7 2018

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. *18 CR-368* |
| | § | UNDER SEAL |
| BRIAN SWIENCINSKI, | § | |
| SCOTT BREIMEISTER, and | § | |
| VLADIMIR REDKO, M.D., | § | |
| | § | |
| Defendants. | § | |

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### Compounded Drugs

1.     Compounded pharmaceuticals were drugs that were combined, mixed, or altered from other drugs by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, physicians' assistants, and nurse practitioners ("prescribers"), to meet the specific needs of individual patients.

2.     Although ingredients in compounded medications were generally approved by the United States Food and Drug Administration ("FDA"), the compounded form of those medications were not. That is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

### Commercial Insurance Plans

3.     Commercial insurance companies, employers, and private entities offered drug plans, which were also administered and operated by Pharmacy Benefit Managers ("PBMs").  A

PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.

4.     A beneficiary in a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

5.     A pharmacy could participate in a privately insured drug plan by entering into an agreement with one or more PBMs acting on behalf of a privately insured plan.  When a privately insured beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim to a PBM that represented that beneficiary's privately insured drug plan. The plan or PBM then adjudicated the claim, that is, determined whether the pharmacy was entitled to payment for each claim.  If the pharmacy was entitled to payment, the PBM then reimbursed the pharmacy.  The drug plan's sponsor, in turn, reimbursed the PBM for its payment to the pharmacy made on behalf of that drug plan.

6.     Express Scripts, Inc. ("ESI"); Argus; Caremark LLC, doing business as ("d/b/a") CVS/Caremark ("CVS/Caremark"); Optum RX, Inc.; Catamaran; and Prime Therapeutics, LLC, among others, were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

**The Medicare Program**

7.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, including to individuals who were 65 years or older or disabled.  The benefits available under Medicare were governed by federal statutes and regulations.  The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as

Medicare "beneficiaries."

8.      Medicare programs covering different types of benefits were separated into different program "parts."  Part D of Medicare (the "Medicare Part D Program" or "Part D") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.

9.      To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies that Medicare approved, often referred to as drug plan "sponsors."  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

10.     A pharmacy could participate in Part D by entering a retail network agreement directly with a plan or with one or more PBM.  A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.  When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan.  The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

11.     Medicare, through CMS, compensated the Medicare drug plan sponsors.  Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.  Such payments were called capitation fees.  The capitation fee was adjusted periodically based on various factors, including the beneficiary's medical conditions.  In addition, in some cases in which a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation

fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

12.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

13.     PBMs ESI and CVS/Caremark, among others, were Medicare drug plan sponsors.

### The TRICARE Program

14.     TRICARE was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.  Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries."  The Defense Health Agency ("DHA"), an agency of the DOD, was the military entity responsible for overseeing and administering the TRICARE program.

15.     TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed medical professional.  PBM ESI administered TRICARE's prescription drug benefits.

16.     In or around May 2015, the DHA implemented a new screening procedure to ensure that TRICARE-covered compounded drugs were safe, clinically necessary, and cost effective, which resulted in a steep decline in TRICARE's reimbursements for compounded drugs.

17.     TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies.  If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable co-pay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to ESI, which would, in turn, adjudicate the claim and reimburse the pharmacy directly or through a

4

Pharmacy Services Administrative Organization ("PSAO"). To become a network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

18.     TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

### The Defendants, Entities, and Relevant Individuals

19.     Defendant **BRIAN SWIENCINSKI** ("**SWIENCINSKI**"), a resident of Dallas, Texas, owned and controlled Worth Medical ("Worth"). Along with his business partners, **SWIENCINSKI** also owned or controlled Pharms, LLC ("Pharms"), a management company formed in or around 2013, and several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

20.     Defendant **SCOTT BREIMEISTER** ("**BREIMEISTER**"), a resident of Houston, Texas, was **SWIENCINSKI**'s business partner. Along with **SWIENCINSKI**, **BREIMEISTER** owned or controlled Pharms, LLC ("Pharms"), a management company formed in or around 2013, and several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

21.     Defendant **VLADIMIR REDKO, M.D.** ("**REDKO**"), a resident of Houston, Texas, was a physician licensed to practice medicine in the State of Texas. **REDKO**, along with **SWIENCINSKI** and their business partners, owned or controlled several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

22.     Physician 2, a resident of Texas, was a physician licensed to practice medicine in the State of Texas.

23.     Physician 3, a resident of Minnesota, was a physician licensed to practice medicine

5

in the State of Minnesota.

24.     Physician 4, a resident of Texas, was a physician licensed to practice medicine in the State of Texas.

25.     James Buckingham ("Buckingham"), a resident of North Royalton, Ohio, was a pharmaceutical sales representative.

26.     Terry Brickman ("Brickman"), a resident of Birmingham, Michigan, was a pharmaceutical sales representative.

## COUNT ONE
### Conspiracy to Commit Healthcare Fraud and Mail Fraud
### (18 U.S.C. § 1349)

27.     The allegations in paragraphs 1 through 26 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

28.     Beginning in or around late 2012 and continuing through in or around 2017, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**BRIAN SWIENCINSKI,**
**SCOTT BREIMEISTER,** and
**VLADIMIR REDKO M.D.**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

a.     to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose

6

of executing the scheme and artifice, did knowingly deliver and cause to be delivered, certain mail matter by the U.S. Postal Service and any private and commercial interstate carrier according to the directions thereon, in violation of Title 18, United States Code, Section 1341; and

b.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), including Medicare, TRICARE, Workers' Compensation, and other government and commercial health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

29.      It was a purpose of the conspiracy for defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.**, and their coconspirators to unlawfully enrich themselves by, among other things: (1) submitting and causing to be submitted false and fraudulent claims to Medicare, TRICARE, and other government and commercial health care benefit programs, for compounded drugs that were often medically unnecessary, based on invalid prescriptions, or never provided; (2) submitting and causing to be submitted false and fraudulent claims to health care benefit programs, including Medicare, TRICARE, Workers' Compensation, and other government and commercial health care benefit programs for compounded drugs based on bribes and kickbacks, many of which were in violation of the Anti-Kickback Statute; (3) concealing the submission of false and fraudulent claims to health care

7

benefit programs and the receipt and transfer of the proceeds from the fraud; and (4) diverting the proceeds of the fraud for their personal use and benefit, and the personal use and benefit of their coconspirators, in the form of compensation, commission payments, and other remuneration.

## Manner and Means of the Conspiracy

The manner and means by which the defendants **BRIAN SWIENCINSKI, SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.**, and their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

30.     Between in or around late 2012 and in or around 2017, **SWIENCINSKI** partnered with **REDKO, BREIMEISTER** and others to found, own, and operate several mail-order compounding pharmacies in or around Houston, Texas, including: OmniPlus Health Care, L.P.; Alternative Medicine and Pharmacy, Inc., d/b/a OmniPlus Pharmacy; Omni-One-Med Pharmacy Services, LLC; Safety and Health Technology, LLC, d/b/a Accu-Care Pharmacy; Kremco Pharmacy, LLC d/b/a Kremco Pharmacy; Healthy Pharmacy Solutions, Inc.; and JSW Prosperity, LLC, d/b/a 1 Stop Pharmacy (collectively "the Pharmacies"). The Pharmacies contracted with several PBMs to file claims for reimbursement for compounded drugs, among other pharmaceuticals.

31.     In or around 2014, **SWIENCINSKI, BREIMEISTER**, and their coconspirators sold some of those pharmacies in straw purchases to employees of Pharms, the management company in which **SWIENCINSKI, BREIMEISTER**, and others maintained an interest.

32.     To maximize reimbursement from the PBMs and other health care benefit programs, the Pharmacies formulated compounded drugs, including pain, scar, and eczema creams, not based on individualized patient need, but instead based on predetermined formulas often designed to maximize reimbursements from Medicare, TRICARE, Workers' Compensation,

and other government and commercial health care benefit programs. The Pharmacies created a series of preprinted prescription forms with the Pharmacies' offerings that were distributed to prescribers across the country to enable them to easily prescribe the expensive compounded drugs.

33. The Pharmacies increased their reimbursements by hiring a network of hundreds of Sales Representatives across the country, including in Texas, Ohio, Michigan, Massachusetts, Nevada, and elsewhere, and by using the services of call centers to market the expensive compounded drugs to prescribers. **SWIENCINSKI** oversaw the Pharmacies' marketing efforts and was himself a Sales Representative.

34. Sales Representatives, including **SWIENCINSKI** and **BREIMEISTER**, were financially incentivized to refer high volumes of prescriptions through commission payments and illegal kickbacks that were calculated based on a percentage of the reimbursements that health care benefit programs—including Medicare, TRICARE and other government and commercial health care benefit programs—paid to the Pharmacies for expensive compounded drug prescriptions attributable to the Sales Representatives.

35. To further increase their commissions, **SWIENCINSKI**, **BREIMEISTER**, and their coconspirators, including Sales Representatives, often directed prescribers, including **REDKO**, Physician 2, and others, to authorize excessive, medically unnecessary prescriptions for compounded and prescription drugs notwithstanding the patients' medical need for such drugs, and many times without seeing or treating the patients.

36. **SWIENCINSKI**, **BREIMEISTER**, and their coconspirators often paid **REDKO**, Physicians 2 and 3, and other prescribers. Some of those payments were in violation of the Anti-Kickback Statute. **SWIENCINSKI**, **BREIMEISTER**, **REDKO**, and their coconspirators also created a "Share Program," which allowed physicians—most of whom were also "high volume"

prescribers to the Pharmacies—to "invest" in shares of some of the Pharmacies and, in return, receive monthly "distribution" payments.

37.    **SWIENCINSKI** also instructed Sales Representatives to sign up themselves, their families, and their friends to maximize commissions.  Specifically, **SWIENCINSKI** instructed Buckingham and Brickman to sign up themselves, their families, and other friends and acquaintances as recipients of expensive compounded drugs, including pain and scar cream and metabolic supplements, which were often medically unnecessary, based on invalid prescriptions, and sometimes not provided.

38.    **REDKO** and Physician 2 purportedly prescribed the expensive compounded drugs, including pain and scar creams and supplements, to Buckingham, Brickman, and their families, friends, and acquaintances.  Although **REDKO** and Physician 2 purportedly prescribed the expensive compounded drugs, neither Buckingham and his family—who resided in Ohio—nor Brickman and his wife—who resided in Michigan—nor many of the friends and acquaintances Buckingham and Brickman referred—who lived in Ohio, Massachusetts, and other states—were patients of, or treated by, either **REDKO** or Physician 2, who resided in Texas and were both unlicensed to practice medicine in Ohio and Michigan.  These prescriptions for the expensive compounded drugs were thus invalid and almost always medically unnecessary.

39.    Other Sales Representatives, including several in Dallas, Texas, often referred their families and others to the Pharmacies to receive compounded drugs.  In exchange for those individuals' agreeing to provide their insurance information, and to accept monthly deliveries of large volumes of often-medically unnecessary compounded drugs, these Sales Representatives offered to pay, and paid a kickback to the individuals they referred, sometimes in violation of the Anti-Kickback Statute.

40.     Many times, the Pharmacies waived often-exorbitant copayments, even though Medicare, TRICARE, and other government and commercial health care benefit programs required the insurance beneficiary to pay the copayments and the Pharmacies to collect such copayments.

41.     Once filled, the Pharmacies often mailed the compounded drugs to the recipients. For a time, the Pharmacies were unlicensed to dispense compounded drugs in Ohio, Michigan, and elsewhere.   To circumvent the pharmacies' and the prescribers' licensing restrictions, the Pharmacies mailed orders for out-of-state patients to **SWIENCINSKI**'s residence in Dallas, Texas.  Many times, **SWIENCINSKI** did not deliver the packages of compounded drugs to the ultimate recipient.

42.     The PBMs occasionally audited the Pharmacies, the prescribers, and the patients who had purportedly been prescribed these expensive compounded drugs.  **SWIENCINSKI**, **BREIMEISTER**, **REDKO**, Brickman, Buckingham, and others conspired to provide false information to the PBMs to make it appear as if the prescriptions for compounded drugs reimbursed by the PBMs were medically necessary,  based on a valid prescription, dispensed to the insurance beneficiaries, and that copayments were properly collected.

43.     The Pharmacies submitted claims to Medicare, TRICARE, Medicaid, Workers' Compensation, and other government and commercial health care benefits, generally through the PBMs, seeking reimbursement for the expensive compounded drugs they dispensed.  Those health care benefit programs, in turn, reimbursed the Pharmacies' claims in reliance upon the representations that **SWIENCINSKI**, **BREIMEISTER**, **REDKO**, Physician 2, and their coconspirators made that the drugs dispensed were medically necessary and based on a valid prescription, dispensed to the insurance beneficiaries, not induced by kickback payments, and that

copayments were properly collected.

44.     Between in or around early 2013 and in or around 2017, Medicare, TRICARE, Medicaid, Workers' Compensation, and other government and commercial health care benefit programs, through the PBMs, reimbursed the Pharmacies over approximately $100 million, much of which was for compounded drugs, which were often medically unnecessary; based on an invalid prescription; not provided; or were predicated on kickbacks, some of which in violation of the Anti-Kickback Statute.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### Healthcare Fraud
### (18 U.S.C. §§ 1347 and 2)

45.     Paragraphs 1 through 26 and 30 through 44 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### The Scheme to Defraud

46.     From in or around 2013 through in or around 2017, in the Houston Division of the Southern District of Texas, and elsewhere, defendants,

**BRIAN SWIENCINSKI** and
**VLADIMIR REDKO, M.D.**

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, in connection with the delivery of and payment for healthcare benefits, items and services, did knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of a health care benefit program.

**Manner and Means of the Scheme to Defraud**

The manner and means by which the defendants **BRIAN SWIENCINSKI** and

**VLADIMIR REDKO, M.D.**, and their coconspirators sought to accomplish the object and

purpose of the scheme to defraud included, among other things, the following:

47.     Paragraphs 30 through 44 of this Indictment are realleged and incorporated as if

fully set forth herein.

**Execution of the Scheme to Defraud**

48.     On or about the dates set forth below, defendants **BRIAN SWIENCINSKI** and

**VLADIMIR REDKO, M.D.**, aiding and abetting and aided and abetted by others, did knowingly

and willfully execute and attempt to execute the aforesaid scheme and artifice to defraud by

submitting and causing the submission to health care benefit programs, including ESI and other

PBMs, of the claims set forth below:

| Family Name and Number of Unique Individuals | Prescribing Physician | Date Range of Prescriptions | Type of Prescriptions | Approx. Amount Reimbursed by PBMs |
|---|---|---|---|---|
| Family J.B. (6) | REDKO | February 3, 2014 – November 20, 2015 | Compounds | $708,603.43 |
| Family T.B. (2) | REDKO | January 6, 2014 – December 14, 2015 | Compounds | $407,308.34 |
| Family P.C. (3) | REDKO | May 13, 2014 – December 19, 2014 | Compounds | $569,667.95 |
| Family T.D. (5) | REDKO | April 23, 2014 – December 19, 2014 | Compounds | $962,765.72 |
| Family P.V. (4) | REDKO | March 31, 2014 – December 18, 2014 | Compounds | $986,062.09 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT THREE
**Conspiracy to Make False Statements Relating to Healthcare Matters**
**(18 U.S.C. § 371)**

49.     Paragraphs 1 through 26 and 30 through 44 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

50.     From in or around February 2015 through in or around July 2016, within the Southern District of Texas and elsewhere, the defendants,

**BRIAN SWIENCINSKI,**
**SCOTT BREIMEISTER, and**
**VLADIMIR REDKO, M.D.**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the grand jury, to commit certain offenses against the United States, that is, to knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically ESI, in violation of Title 18, United States Code, Section 1035.

### Purpose of the Conspiracy

51.     It was a purpose of the conspiracy for defendants **BRIAN SWIENCINSKI, SCOTT BREIMEISTER,** and **VLADIMIR REDKO M.D.,** and their coconspirators to (1) obtain and retain reimbursements from ESI and other PBMs by providing false information to ESI in response to ESI's inquiries and audits, and (2) avoid detection of their scheme to defraud.

## Manner and Means

The manner and means by which the defendants **BRIAN SWIENCINSKI, SCOTT BREIMEISTER,** and **VLADIMIR REDKO, M.D.**, and their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

52.     Paragraphs 30 through 44 of this Indictment are realleged and incorporated as if fully set forth herein.

## Overt Acts

53.     In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas and elsewhere, the following overt acts:

a.     On or about February 27, 2015, James Buckingham forwarded to **SWIENCINSKI** a questionnaire that ESI had sent to Buckingham's wife regarding prescriptions she and their children purportedly received from Omni-One-Med.

b.     On or about February 27, 2015, **SWIENCINSKI** forwarded the same questionnaire to **BREIMEISTER**.

c.     On or about March 2, 2015, **BREIMEISTER** forwarded the same questionnaire to **REDKO**, the prescribing physician on the claims under review, requesting advice on how the patients should respond to ESI.

d.     **SWIENCINSKI, BREIMEISTER,** or one of their coconspirators, instructed Buckingham on how to respond to ESI's questionnaire.  Based on that instruction, Buckingham falsely notified ESI that his wife and children: paid copays for the compounded drugs they purportedly received from Omni-One-Med; obtained the prescriptions by mail in Dallas; and received treatment from **REDKO**, who was the

prescriber.  Buckingham signed and dated the questionnaires on or about March 2, 2015.

e.      Buckingham later instructed at least one other individual he referred to the Pharmacies on how to fill out similar questionnaires from ESI using the same false information, which were later sent to ESI.

f.      In or around July 2016, **REDKO** provided false information to ESI in response to an inquiry regarding compounded drugs **REDKO** purportedly prescribed to several patients, including Buckingham's wife and children.  Specifically, **REDKO** falsely responded to ESI that he had seen the patients under review and that he authorized prescriptions for compounded drugs for those individuals, among other falsehoods. **REDKO** signed and dated the questionnaires on or about July 5, 2016.

All in violation of 18 U.S.C. § 371.

## COUNTS FOUR THROUGH SIX
### False Statements Relating to Healthcare Matters
### (18 U.S.C. §§ 1035 and 2)

54.     Paragraphs 1 through 26 and 30 through 44 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

55.     On or about July 5, 2016, in the Southern District of Texas and elsewhere, the defendant,

### VLADIMIR REDKO, M.D.

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in

connection with the delivery of and payment for health care benefits, items, and services, and in a

matter involving a health care benefit program, specifically ESI:

| Count | Insurance Beneficiary | Description of False Statement |
|-------|----------------------|-------------------------------|
| 4 | A.B. | Response to ESI Questionnaire Regarding Compound Drug Prescriptions Prescribed to A.B. on or about October 23, 2014 |
| 5 | T.D. | Response to ESI Questionnaire Regarding Compound Drug Prescriptions Prescribed to T.D. on or about October 31, 2014 |
| 6 | R.D. | Response to ESI Questionnaire Regarding Compound Drug Prescriptions Prescribed to R.D. on or about October 31, 2014 |

All in violation of Title 18, United States Code, Sections 1035 and 2.

## COUNT SEVEN
### Conspiracy to Pay and Receive Kickbacks
### (18 U.S.C. § 371)

56.     Paragraphs 1 through 26 and 30 through 44 of this Indictment are realleged and

incorporated by reference as though fully set forth herein.

57.     Between in or around late 2012 and in or around 2017, the exact dates being

unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and

elsewhere, the defendants,

**BRIAN SWIENCINSKI,**
**SCOTT BREIMEISTER, and**
**VLADIMIR REDKO, M.D.**

did knowingly and willfully combine, conspire, confederate and agree with others known and

unknown to the grand jury, to commit certain offenses against the United States, that is,

a.      to violate Title 42, United States Code, Section 1320a-7b(b)(1), by

knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and

bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare, TRICARE, or Workers' Compensation; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare, TRICARE, and Workers' Compensation; and

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare, TRICARE, or Workers' Compensation; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare, TRICARE, or Workers' Compensation.

## Purpose of the Conspiracy

58.    It was a purpose of the conspiracy for the defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.**, and their coconspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare, TRICARE, and Workers' Compensation beneficiaries for whom the Pharmacies submitted claims to Medicare, TRICARE, and Workers' Compensation through the PBMs.

**Manner and Means of the Conspiracy**

The manner and means by which the defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.**, and their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

59. Paragraphs 30 through 44 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

**Overt Acts**

60. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas and elsewhere, the following overt acts:

a. Physician 4 prescribed compounded drugs and other pharmaceuticals to TRICARE beneficiaries. In or around December 2014, TRICARE reimbursed the Pharmacies at least approximately $278,000 for those prescriptions.

b. In or around December 2014, Pharms paid a Sales Representative over approximately $141,000—approximately 50% of the amount TRICARE reimbursed—for TRICARE prescriptions that Physician 4 wrote to the Pharmacies.

c. In or around October 2015, the Pharmacies processed prescriptions for compounded drugs and other pharmaceuticals written by Physician 2 to Medicare beneficiaries. Medicare, in turn, reimbursed the Pharmacies for those prescriptions.

d. Between in or around October and in or around November 2015, **SWIENCINSKI** paid or caused the payment of Physician 2 over approximately $40,000 from JPMorgan Chase accounts ending *6280 and *9708.

19

e.      In or around October 2015, the Pharmacies processed prescriptions for compounded drugs and other pharmaceuticals written by Physician 3 to Medicare beneficiaries.  Medicare, in turn, reimbursed the Pharmacies for those prescriptions.

f.      Between in or around October and in or around November 2015, **SWIENCINSKI** paid or caused the payment of Physician 3 over $7,500 from JPMorgan Chase account ending *9708.

All in violation of Title 18, United States Code, Section 371.

## COUNT EIGHT
### Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity
### (18 U.S.C. §§ 1957 and 2)

61.      Paragraphs 1 through 26 and 30 through 44 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

62.      On or about December 9, 2014 in the Southern District of Texas, and elsewhere, the defendant

### BRIAN SWIENCINSKI

aided and abetted by others, known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Conspiracy to Commit Healthcare Fraud and Mail Fraud, in violation of 18 U.S.C. § 1349, as follows:

| Account Name | Payer Account | Debit | Payee(s) | Payee Account |
|---|---|---|---|---|
| Worth Medical Company | JPMorgan Chase x 9708 | $100,000 | Brian SWIENCINSKI or Nidia Martinez | JPMorgan Chase x 6280 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT NINE
### Witness Tampering
### (18 U.S.C. § 1512(b)(3))

63.　　Paragraphs 1 through 26 and 30 through 44 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

64.　　In or around May 2018, in the Northern District of Texas and intending to affect a proceeding in the Southern District of Texas, the defendant,

### BRIAN SWIENCINSKI

did knowingly attempt to corruptly persuade another person with the intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission and possible commission of a Federal offense.

All in violation of Title 18, United States Code, Section 1512(b)(3).

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.**, that, upon conviction of Counts One through Seven, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(1))

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States of America gives notice to defendant **BRIAN SWIENCINSKI** that, upon conviction of Count Eight, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

**Money Judgment and Substitute Assets**

Defendants **BRIAN SWIENCINSKI**, **SCOTT BREIMEISTER**, and **VLADIMIR REDKO, M.D.** are notified that upon conviction, a money judgment may be imposed against each defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment.

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALEZA REMIS
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE